UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Respondent, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-cr-20022-SLD-EIL |
| | ) | |
| MATTHEW HIGGINS-VOGT, | ) | |
| | ) | |
| Defendant-Petitioner. | ) | |

## ORDER

Before the Court are Defendant-Petitioner Matthew Higgins-Vogt's *pro se* motion under 28 U.S.C. § 2255 ("Pro Se 2255 Motion"), ECF No. 58, counseled Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255 ("Counseled 2255 Motion"), ECF No. 64, and motion for a status conference, ECF No. 67. For the reasons that follow, the § 2255 motions are DENIED, and the motion for a status conference is MOOT.

## BACKGROUND

On February 16, 2017, a criminal complaint was filed charging Higgins-Vogt with Hobbs Act robbery in violation of 18 U.S.C. § 1951(a), brandishing a firearm during a crime of violence in violation of 18 U.S.C. § 924(c), and possession of a firearm by a felon in violation of 18 U.S.C. § 922(g). Compl. 1, ECF No. 1. Attorneys Anthony and Evan Bruno were appointed to represent him. Feb. 17, 2017 Min. Entry. A grand jury subsequently indicted Higgins-Vogt on the same charges. *See* Indictment 1–3, ECF No. 9. A superseding indictment[1] was returned on September 6, 2017 charging Higgins-Vogt with conspiracy to commit Hobbs Act robbery in

---

[1] A first superseding indictment was returned on July 12, 2017 adding two additional charges: killing a witness in violation of 18 U.S.C. § 1512(a)(1) and use of a firearm resulting in death in violation of 18 U.S.C. §§ 924(c), (j)(1), and 1111. Superseding Indictment 4–5, ECF No. 14. But the parties agreed to dismiss those counts without prejudice. *See* Consent Mot. Dismiss, ECF No. 19; Aug. 25, 2017 Text Order (granting consent motion).

violation of 18 U.S.C. § 1951(a) (count one); Hobbs Act robbery in violation of 18 U.S.C.

§ 1951(a) (count two); brandishing a firearm during a crime of violence in violation of 18 U.S.C.

§ 924(c) (count three); and possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)

(count four).  *See* Second Superseding Indictment 1–6, ECF No. 22.

Higgins-Vogt moved to suppress statements he made on May 20 and May 27, 2015, as

well as recorded conversations and physical evidence that were obtained as a result of those

statements on the basis that they were "coerced confessions."  *See* Mot. Suppress 1, ECF No.

18.[2]  Judge Colin Bruce, then presiding over the case, held a hearing on the motion on September

18, 2017.  Sept. 18, 2017 Min. Entry.  He then denied the motion by written order.  Oct. 4, 2017

Order, ECF No. 27.[3]

Higgins-Vogt entered a conditional guilty plea to the charges against him.  *See* Oct. 30,

2017 Min. Entry.  He reserved the right to appeal the denial of his motion to suppress.  Not.

Conditional Plea, ECF No. 34.

The United States Probation Office ("USPO") prepared a presentence investigation report

("PSR") in advance of sentencing.  *See* PSR, ECF No. 40.  The PSR listed the following offense

conduct.  Higgins-Vogt, Kelton Snyder, and Paige Mars agreed to rob a Circle K convenience

store in Decatur, Illinois.  *Id.* ¶ 11.  On April 3, 2015, at approximately 2:30 a.m., Higgins-Vogt

and Snyder carried out the robbery.  *Id.* ¶ 12.  Mars served as the getaway driver.  *See id.* ¶ 11.

Snyder held a shotgun behind the Circle K cashier and ordered him to the ground.  *See id.* ¶¶ 12,

---

[2] He also requested that statements made on April 8, 2015 be suppressed, Mot. Suppress 1, but that part of the motion was mooted because the Government did not intend to rely on those statements, *see* Mot. Suppress Hr'g Tr. 3:11–23, ECF No. 32.

[3] Subsequently, Higgins-Vogt moved for reconsideration of the order or in the alternative for leave to file a supplemental motion to raise an argument that had not been expressly made until oral argument: that any fruits of the statements made on April 8, 2015 be suppressed as well.  Mot. Reconsider 1–2, ECF No. 28.  While noting that "defense counsel failed to properly raise the argument," Judge Bruce ordered limited briefing on the issue "[o]ut of an abundance of caution."  Oct. 12, 2017 Order 3, ECF No. 29.  He later denied the motion.  Nov. 6, 2017 Order 2, ECF No. 37.

14 (indicating that the shorter robber held the shotgun and that Higgins-Vogt was the taller robber).  They also tied up a customer who came into the store during the robbery.  *Id.* ¶ 13.  Higgins-Vogt and Snyder took liquor from the store and approximately $700 from the cash register.  *Id.* ¶ 12.

After the robbery, "Mars and Snyder began expressing romantic interest in each other." *Id.* ¶ 20.  Mars told her relatives, but some of them "advised her to not become involved with Snyder, telling her that he was physically abusive to the women he dated."  *Id.*  "Mars raised these issues with Snyder and they had a falling out."  *Id.*  On April 5, 2015, Snyder admitted to Brandon Burwell that he and Higgins-Vogt robbed the Circle K.  *Id.* ¶ 21.  "Snyder told Burwell that he was worried that [Mars] would go to law enforcement and report his involvement in the robbery."  *Id.*  ¶ 22.  He "told Burwell that he was going to have to 'get rid of her.'"  *Id.*  Snyder and Higgins-Vogt met that night and "discussed their concerns about Mars speaking to the police."  *Id.* ¶¶ 23–24.  They came to an understanding "that she would be killed."  *Id.* ¶ 24.  They decided Higgins-Vogt would carry out the murder because of Snyder's recent fight with Mars.  *Id.* ¶ 25.  Later that night, Higgins-Vogt met with Mars, and the two drove to a river on the pretense that Higgins-Vogt "needed to drop the shotgun used in the robbery in the river."  *Id.* ¶ 26.  When they arrived at the river, Higgins-Vogt used the same shotgun used in the robbery to murder Mars.  *Id.* ¶ 27.

USPO found that Higgins-Vogt's total offense level was 40 for counts one, two, and four, *id.* ¶ 61, and his criminal history category was IV, *id.* ¶ 72.  Accordingly, his Sentencing Guidelines imprisonment range would be 360 months to life on counts one, two, and four.  *Id.* ¶ 113.  Because counts one and two had a statutory maximum of twenty years (or 240 months) of imprisonment, *id.* ¶ 111 (citing 18 U.S.C. § 1951(a)), and count four had a statutory maximum of

ten years (or 120 months) of imprisonment, *id.* (citing 18 U.S.C. §§ 922(g), 924(a)(2)), those became the Guideline ranges for those counts, *id.* ¶ 113.  However, the sentences imposed on the various counts could be run consecutively to impose total punishment.  *See id.* (citing U.S. Sent'g Guidelines Manual § 5G1.2(d) (U.S. Sent'g Comm'n 2016)).  Higgins-Vogt faced a mandatory minimum seven years of imprisonment on count three which was required by statute to be run consecutive to the remainder of the sentence.  *Id.* ¶¶ 111, 113 (citing 18 U.S.C. § 924(c)).  The statutory maximum for count three was life.  *Id.* ¶ 111.  Higgins-Vogt made no objections to the PSR.

At the sentencing hearing, Judge Bruce adopted the contents of the PSR.  Sentencing Hr'g Tr. 5:4–7, ECF No. 53.  The Government requested the statutory maximum on all counts with a life sentence on the brandishing a firearm count to be run consecutive.  *Id.* at 13:24–14:4.  Higgins-Vogt asked for "a sentence of below life at the guideline range."  *Id.* at 19:22–23.  After walking through the factors laid out in 18 U.S.C. § 3553(a), *id.* at 21:14–28:11, Judge Bruce sentenced Higgins-Vogt to a total of 720 months of imprisonment: 240 months on count one; 240 months on count two to be run consecutive to count one; 120 months on count three to be run consecutive to counts one and two; and 120 months on count four to be run consecutive to the other counts.  *Id.* at 28:12–24.  He imposed a three-year term of supervised release.  *Id.* at 29:2–8.

Higgins-Vogt appealed.  *See* Not. Appeal, ECF No. 43.  The denial of the motion to suppress was affirmed.  *See United States v. Higgins-Vogt*, 911 F.3d 814, 817 (7th Cir. 2018).

In February 2020, Higgins-Vogt filed the Pro Se 2255 Motion, in which he argued that he should be resentenced or allowed to withdraw his guilty plea for the following reasons:  Judge Bruce had a disqualifying bias—based on *ex parte* communications he had with the United

4

States Attorney's Office for the Central District of Illinois ("USAO")—which required him to recuse himself, Pro Se 2255 Mot. 2; Judge Bruce allowed him to plead guilty to a crime without admitting all of the elements of the crime and where "[t]here was not [a] sufficient factual basis" for his plea, *id.* at 3–4; Judge Bruce and his counsel failed to adequately explain the issues he was preserving for appeal, *id.* at 4–6; Judge Bruce allowed him to plead guilty to a defective indictment, *id.* at 6; his counsel provided ineffective assistance of counsel by failing to object to the defective indictment, *id.* at 6–11; his counsel provided ineffective assistance by failing to inform him that he could "ask[] the court to perform a Federal Rules of Criminal Procedure Rule 403 Balancing Analysis" for the statements he made to law enforcement, *id.* at 11–13; his counsel provided ineffective assistance with respect to the motion to suppress, *id.* at 13–16; and his § 924(c) charge must be vacated under *United States v. Davis*, 139 S. Ct. 2319 (2019), *id.* at 16–17.

Judge Bruce recused himself from hearing Higgins-Vogt's § 2255 motion, and the case was reassigned to this Court. *See* Feb. 19, 2020 Text Order of Recusal. The Court appointed counsel to represent Higgins-Vogt, *see* Mar. 27, 2020 Text Order; Apr. 29, 2020 Text Order, and counsel filed the Counseled 2255 Motion on October 8, 2020. The Counseled 2255 Motion, "which is intended to supplement" the Pro Se 2255 Motion, Counseled 2255 Mot. 1–2, raises three claims: first, that Judge Bruce violated Higgins-Vogt's due process rights; second, that Judge Bruce violated 28 U.S.C. § 455(a) by failing to recuse himself due to an appearance of bias, *id.* 14–15; and third, that the Federal Public Defender's Office ("FPD") provided Higgins-Vogt with ineffective assistance of counsel by failing to include claims based on Judge Bruce's *ex parte* communications in his appeal and in failing to obtain agreements with the Government to toll the time for Higgins-Vogt to bring his claims, *id.* at 25–26.

The Government filed a response arguing that: 1) any claims related to the indictment are procedurally defaulted or waived; 2) the ineffective assistance of counsel claims are meritless; 3) Higgins-Vogt fails to show that Judge Bruce was actually biased against him; and 4) the statutory recusal claim is not cognizable under § 2255. Resp. 1, ECF No. 65. No reply was filed.

## DISCUSSION

### I.  Legal Standard

A prisoner in federal custody may move the court that imposed his sentence to vacate, set aside, or correct it. 28 U.S.C. § 2255(a). "[R]elief under § 2255 is an extraordinary remedy because it asks the district court essentially to reopen the criminal process to a person who already has had an opportunity for full process." *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007). Accordingly, such relief "is available only when the 'sentence was imposed in violation of the Constitution or laws of the United States,' the court lacked jurisdiction, the sentence was greater than the maximum authorized by law, or it is otherwise subject to collateral attack." *Torzala v. United States*, 545 F.3d 517, 521 (7th Cir. 2008) (quoting 28 U.S.C. § 2255(a)).

### II.  Analysis

Because the Counseled 2255 Motion was intended to supplement the Pro Se 2255 Motion, and because the Government addresses claims made in both motions, the Court endeavors to address all of Higgins-Vogt's claims.

### A.  Claims Related to Plea

#### 1.  Factual Basis for Conspiracy Claim

First, Higgins-Vogt argues that Judge Bruce "allowed [him] to plead guilty to a crime

that [he] did not admit to all the elements of at the Change Of Plea hearing."  Pro Se 2255 Mot.

3.  Higgins-Vogt contends that he did not admit that he and Snyder agreed to commit Hobbs Act

robbery and there was not a sufficient factual basis for his guilty plea to count one, conspiracy to

commit Hobbs Act robbery.  *Id.* at 3–4.  The Government does not clearly respond to this

argument.[4]

Nevertheless, the Court finds the claim belied by the record.  "To prove . . . Hobbs Act

conspiracy, the government must establish that two or more persons agreed to commit an

unlawful act, and that the defendant knowingly and intentionally joined in the agreement."

*United States v. Haynes*, 582 F.3d 686, 698 (7th Cir. 2009), *abrogated on other grounds by*

*United States v. Vizcarra*, 668 F.3d 516 (7th Cir. 2012).  The agreement need not be explicit;

there simply must be "an understanding . . . among co-conspirators to work together to commit

the offense."  *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003).  "Two or more persons

conspire[] together if they embrace[] a common criminal objective . . . ."  *Haynes*, 582 F.3d at

698 (quotation marks omitted).

At Higgins-Vogt's change of plea hearing, the Government identified the correct

elements of the offense.  Change of Plea Hr'g Tr. 13:8–13, ECF No. 52.[5]  The Government

offered the following as part of the evidence it would present if the case proceeded to trial:

---

[4] It only addresses the elements of the conspiracy charge in its background section where it describes what took place at the change of plea hearing.  *See* Resp. 9–10.
[5] The Government also included as an element of the offense an overt act taken in furtherance of the conspiracy "out of an abundance of caution," Change of Plea Hr'g Tr. 13:14–20, but the Seventh Circuit subsequently clarified that a Hobbs Act conspiracy does not require an overt act, *United States v. Jett*, 908 F.3d 252, 265 (7th Cir. 2018).

> [I]n late March of 2015, . . . Higgins-Vogt, and his former prison mate, Kelton Snyder, stole two shotguns from the garage of Brandon Burwell. On Friday, April 3, 2015, Higgins-Vogt and Snyder used one of those shotguns to rob a Circle K gas station of approximately $700. . . . Surveillance footage captured showed images of Snyder who was holding the shotgun and Higgins-Vogt who was filling a bag with cash. Snyder held the cashier and a Circle K customer at gunpoint while Higgins-Vogt obtained the money. . . . During the robbery, Paige Mars waited outside the gas station in her car to drive the robbers away from the scene.

*Id.* at 23:3–19. Judge Bruce asked Higgins-Vogt if he "d[id] what [the Government] said [he] did," *id.* at 26:7, to which Higgins-Vogt responded, "Yes," *id.* at 26:8. Higgins-Vogt also confirmed that in April 2015, he and "Snyder robbed the Circle K in Decatur," *id.* at 26:20–23; that "Snyder . . . used a shotgun to threaten" a cashier and customer, *id.* at 27:2–6; and that he "then . . . took money and alcohol and some other things from the Circle K," *id.* at 27:7–9.

This is a sufficient factual basis to find that Higgins-Vogt and Snyder conspired to commit robbery. They worked together and had a common criminal objective: to rob the Circle K. *Cf. United States v. Jett*, 908 F.3d 252, 267 (7th Cir. 2018) ("The government needed only to prove that they conspired to commit bank robbery, and it admitted surveillance footage that a jury could easily conclude showed Jett and McKissick actually committing the bank robberies together. Cell-phone data further confirmed that both men were in the area of the check-and-cash locations around the times they were robbed."). This claim is denied.

### 2. Explanation of Issues Being Preserved for Appeal

Next, Higgins-Vogt argues that Judge Bruce "failed to adequately explain the issues being preserved for appeal." Pro Se 2255 Mot. 4. The Government only addresses this in the context of the related ineffective assistance of counsel claim. *See* Resp. 31–32, 38.

Again, this claim is meritless. The bounds of Higgins-Vogt's contention are not clear. He states that "[a]t no time did the court explain that certain parts of [his] motion to suppress

would not be appealed." Pro Se 2255 Mot. 5. He does not explain what issues were not raised or what issues he believes were not preserved. The record shows that he preserved his right to appeal the entirety of Judge Bruce's denial of his motion to suppress. The written notice of conditional plea indicates that Higgins-Vogt was reserving his right to appeal the October 4, 2017 denial of his motion to suppress. *See* Not. Conditional Plea 1. And at the change of plea hearing, Higgins-Vogt confirmed that "[t]he only plea agreement that [he] ha[d] [wa]s an agreement . . . that [he] [was] reserving in writing . . . the right to appeal [the] denial of [his] motion to suppress." Change of Plea Hr'g Tr. 22:8–18.

That counsel may have chosen not to raise all issues on appeal does not mean those issues were not preserved. The record shows that Judge Bruce ensured that Higgins-Vogt understood that he was preserving his right to appeal the denial of his motion to suppress. This claim is denied.

### B.  Claims Related to Indictment

Next, Higgins-Vogt argues that the second superseding indictment was defective. Pro Se 2255 Mot. 6.[6] He argues that count one (conspiracy to commit Hobbs Act robbery) is duplicitous because it combines three separate conspiracies: a conspiracy to commit Hobbs Act robbery, an obstructing justice conspiracy, and a murder conspiracy. *Id.* at 7. He argues that count three (the § 924(c) charge for brandishing a firearm during a crime of violence) is duplicitous because it charged him "with two sep[a]rate ways [of violating the statute] in one count, aiding and abetting, and Pinkerton co-conspirator liability." *Id.* at 9. Moreover, he argues that because the Government acknowledged that its theory was co-conspirator liability at the

---

[6] He frames this both as a claim that Judge Bruce "allowed [him] to plead guilty to charges in a defective indictment" and as a claim that his counsel was ineffective for failing to object to the defective indictment. Pro Se 2255 Mot. 6.

change of plea hearing, he could not be found guilty of § 924(c) because conspiracy to commit Hobbs Act robbery is not a crime of violence. *See id.* at 9–10. Finally, Higgins-Vogt argues that count four (felon in possession) is both duplicitous and was prejudicially joined. *Id.* at 10–11. He contends that count four improperly charged him with two § 922(g) violations—one on April 3, 2015, and one on April 5, 2015—and that the April 5, 2015 charge should have been tried separately since it was intertwined with Mars's murder, which would prejudicially affect the resolution of counts one, two, and three. *Id.*

The Government argues that Higgins-Vogt procedurally defaulted his defective indictment claims by failing to "contest the validity of the indictment at the district court" or on appeal and that he cannot show cause and prejudice to excuse the default. Resp. 21–26.

### 1. Procedural Default

"A claim cannot be raised for the first time in a § 2255 motion if it could have been raised at trial or on direct appeal." *McCoy v. United States*, 815 F.3d 292, 295 (7th Cir. 2016). Procedural default can be excused "if the prisoner can demonstrate that he is 'actually innocent' of the crimes of which he was convicted" or on a showing of "cause and prejudice for the default." *Id.* Ineffective assistance of counsel can establish cause for procedural default. *Castellanos v. United States*, 26 F.3d 717, 718 (7th Cir. 1994).

The record reflects that Higgins-Vogt raises these issues for the first time in his Pro Se 2255 Motion. He does not expressly address procedural default, but he argues that his counsel was ineffective for failing to object to the indictment, Pro Se 2255 Mot. 6–11, which could serve to excuse his procedural default, so the Court will address that here.

### 2.  Ineffective Assistance of Counsel

#### i.  Legal Background

The Sixth Amendment guarantees criminal defendants the right to the effective assistance

of counsel.  U.S. Const. amend. VI.  Claims of ineffective assistance of counsel are subject to the

two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  This test requires a

defendant to show that his counsel's performance "fell below an objective standard of

reasonableness" and that he suffered prejudice as a result.  *Id.* at 688, 692.  To demonstrate

prejudice, the defendant "must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different."  *Id.* at 694.

#### ii.  Analysis

The Government argues that "[t]he perceived errors in the indictment that Higgins-Vogt

raises . . . are not errors at all . . . but rather frivolous arguments based on misunderstandings of

the law."  Resp. 31.  The Court agrees and, accordingly, concludes that Higgins-Vogt's attorneys

were not ineffective for failing to object to the second superseding indictment and that Higgins-

Vogt cannot show cause and prejudice in order to overcome his procedural default.

##### a.  Count One: Conspiracy to Commit Hobbs Act Robbery

Count one of the second superseding indictment charged Higgins-Vogt with conspiring

with Snyder to rob the Circle K "by means of actual and threatened force, violence and fear of

injury, immediate and future."  Second Superseding Indictment 1–2.  The indictment alleged that

the "objects of th[e] criminal conspiracy included to conduct a robbery of the Circle K, to

distribute and reap the profits from this robbery, and to do so without detection or apprehension

by law enforcement authorities."  *Id.* at 2.  And it alleged that the following acts were taken in

furtherance of the conspiracy: Higgins-Vogt and Snyder robbed the Circle K and Mars served as

the getaway driver, Higgins-Vogt and Snyder "met to discuss the possibility that . . . Mars may alert law enforcement authorities about the robbery," and Higgins-Vogt and Snyder killed Mars. *See id.* at 2–3.

Higgins-Vogt argues that this count is duplicitous because it charges him with three separate conspiracies: a conspiracy to rob the Circle K, an obstructing justice conspiracy, and a murder conspiracy. Pro Se 2255 Mot. 7. He argues that the actions taken after he and Snyder robbed the Circle K are beyond the scope of a Hobbs Act robbery conspiracy. *Id.* at 8.

"An indictment that charges two or more distinct offenses within a single count is duplicitous." *United States v. Miller*, 883 F.3d 998, 1003 (7th Cir. 2018) (quotation marks omitted). But count one does not charge Higgins-Vogt with three separate offenses; instead, it charges him with one conspiracy that has multiple aims—to commit the Hobbs Act robbery and to do so without detection. *See* Second Superseding Indictment 2. "[E]fforts to conceal a conspiracy are not automatically a part of the conspiracy," but that does not mean that "a conspiracy can never include an agreement to conceal the defendants' conduct." *United States v. Masters*, 924 F.2d 1362, 1368 (7th Cir. 1991). While a conspiracy to conceal may not be inferred from evidence merely showing that defendants took actions to cover up their crimes, a conspiracy can include an agreement "among the conspirators to continue to act in concert in order to cover up, for their own self-protection, traces of the crime after its commission." *Id.* (quotation marks omitted).

Here, the indictment alleges that the conspiratorial agreement contemplated an agreement to conceal the crime from law enforcement. *See* Second Superseding Indictment 2. Thus, the efforts to conceal the Hobbs Act robbery, including the murder of Mar, are properly considered part of the charged conspiracy. *Cf. United States v. W.R. Grace*, 429 F. Supp. 2d 1207, 1222 (D.

12

Mont. 2006) ("[A]cts taken to conceal a criminal conspiracy will be considered acts in furtherance of the conspiracy when the acts of concealment were contemplated by the original conspiratorial agreement and carried out in furtherance of the main criminal objectives of the charged conspiracy."); *United States v. Neuman*, No. 11-CR-00247-BR, 2012 WL 1151032, at *3 (D. Or. Apr. 4, 2012) ("The overarching conspiracy alleged in Count One describes the same scheme from start to finish; *i.e.,* to divert the Exchange Funds for the benefit of Defendants and to conceal that diversion from the Exchangers to prevent it from coming to light in the first place . . . .").

Higgins-Vogt's counsel were not ineffective for failing to argue that count one was duplicitous.

### b.  Count Three: Brandishing a Firearm

Count three of the second superseding indictment charged Higgins-Vogt with "knowingly brandish[ing], carry[ing], and us[ing] a firearm . . . during and in relation to a crime of violence, that is, the interference of commerce by violence as charged in Count 2 of this Indictment" in violation of 18 U.S.C. § 924(c).  Second Superseding Indictment 5.  (Count two charged Higgins-Vogt with Hobbs Act robbery or, in other words, "obstruct[ing], delay[ing], and affect[ing] commerce and the movement of articles and commodities in commerce by robbery" in violation of 18 U.S.C. § 1951(a) based on the robbery of the Circle K.  *Id.* at 4.)  Count three indicated that Higgins-Vogt was being held liable via aiding and abetting liability or co-conspirator liability under *Pinkerton v. United States*, 328 U.S. 640 (1946).  Second Superseding Indictment 5.

Higgins-Vogt argues that this count is duplicitous because it "charged [him] with two sep[a]rate ways in one count, aiding and abetting, and Pinkerton co-conspirator liability."  Pro Se

2255 Mot. 9.  He contends "[i]t can only be one or the other, not both." *Id.*  Further, he argues

that because the Government said it was relying on co-conspirator liability at the change of plea

hearing, Change of Plea Hr'g Tr. 14:12–16, the § 924(c) charge must relate to count one, the

conspiracy charge, and thus the § 924(c) charge is improper because conspiracy to commit

Hobbs Act robbery is not a crime of violence, Pro Se 2255 Mot. 9–10, 16–17; *see also Davis*,

139 S. Ct. at 2325, 2336 (holding that the residual clause of § 924(c) was unconstitutional and

affirming the lower court's vacatur of the defendants' § 924(c) convictions which were based on

conspiracy to commit Hobbs Act robbery as predicate offenses).

      None of Higgins-Vogt's contentions have merit.  First, "[a] count is not duplicitous . . if it

. . . charges the commission of a single offense by different means."  *United States v. Berardi*,

675 F.2d 894, 897 (7th Cir. 1982).  And second, Higgins-Vogt is conflating the theory of his

liability with the predicate crime of violence the § 924(c) charge is based on.  The second

superseding indictment expressly states that the predicate crime of violence is count two, which

charged Higgins-Vogt with Hobbs Act robbery.  Second Superseding Indictment 5.  Co-

conspirator liability is just the method of holding Higgins-Vogt liable for his co-defendant's

brandishing of a firearm during a completed Hobbs Act robbery.  Put differently, the indictment

sought to hold Higgins-Vogt responsible for Snyder's brandishing of a firearm in furtherance of

the completed Hobbs Act robbery, not in furtherance of their conspiracy to commit Hobbs Act

robbery.  This is a permissible method of holding a defendant liable under § 924(c).  *See Reyes v.*

*United States*, 998 F.3d 753, 759 (7th Cir. 2021) (finding jury instructions proper where they

"permitted conviction for § 924(c) only if [a] gun was brandished in furtherance of [a] robbery

itself, not merely in furtherance of a conspiracy"); *United States v. Howell*, No. 18-3216, 2021

WL 3163879, at *4 (3d Cir. July 27, 2021) ("Even if, as we assume here, conspiracy to commit

Hobbs Act robbery were not a valid predicate offense, guilt may nonetheless be found for the

§ 924(c) offense under *Pinkerton* based on a coconspirator who also completed the armed Hobbs

Act robbery.”); *cf. United States v. Worthen*, 60 F.4th 1066, 1070–71 (7th Cir. 2023) (reaching a

similar conclusion with respect to aiding and abetting liability).

Higgins-Vogt’s counsel were not ineffective for failing to raise these arguments.

### c.   Count Four: Felon in Possession

Count four of the second superseding indictment charged Higgins-Vogt with “knowingly

possess[ing] a firearm . . . which had travelled in interstate commerce” “[o]n or about April 3,

2015, through April 5, 2015” after having been convicted of a crime punishable by imprisonment

for a term exceeding one year.  Second Superseding Indictment 6.

Higgins-Vogt argues that this count is duplicitous because it charged him with two

separate offenses: possession of the firearm on April 3 and possession of the firearm on April 5.

*See* Pro Se 2255 Mot. 10.  He argues these should have been charged separately and the April 5

possession should have been charged in a separate indictment because his possession on April 3

would have been pursued through an aiding or abetting or co-conspirator liability theory and his

possession on April 5 was intertwined with Mars’s murder, which would have had a prejudicial

effect on the remaining counts in the indictment.  *Id.* at 10–11.

Higgins-Vogt’s duplicity argument is meritless because the indictment charges him with

one act of possession from on or about April 3 through April 5, not two separate acts of

possession.  *See* Second Superseding Indictment 6.  “Where the indictment fairly interpreted

alleges a continuing course of conduct, during a discrete period of time, the indictment is not

prejudicially duplicitous.”  *United States v. Davis*, 471 F.3d 783, 790 (7th Cir. 2006) (quotation

marks omitted).  Moreover, “where . . . ‘on or about’ language is used, the government need not

prove the exact date of the offense as long as a date *reasonably near* that named in the indictment is established." *United States v. Blanchard*, 542 F.3d 1133, 1143 (7th Cir. 2008) (quotation marks omitted).  And here, the Government clarified at the change of plea hearing that its evidence showed that Higgins-Vogt possessed a firearm on April 5, 2015, *see* Change of Plea Hr'g Tr. 29:3–17, which is within the dates alleged in the indictment.

To the extent Higgins-Vogt suggests his counsel should have argued this count was prejudicially joined with the remaining counts of the indictment, that argument would be meritless as well.  "To obtain a new trial for prejudicial joinder . . . , a defendant must be able to show that the denial of severance caused him actual prejudice in that it prevented him from receiving a fair trial; it is not enough that separate trials may have provided him a better opportunity for an acquittal." *United States v. States*, 652 F.3d 734, 743 (7th Cir. 2011) (quotation marks omitted).  Higgins-Vogt is suggesting that because the possession of a firearm on April 5, 2015 was intertwined with a murder, that would prejudice his ability to receive a fair trial on the remaining counts.  But as the Court has already ruled, the murder was appropriately considered as part of count one, the conspiracy charge.  Evidence about the murder would already be part of the case, so there would be no reason to sever count four.  *Cf. id.* at 744 ("[T]his is not a case where, for example, the jury might have been unable or unwilling to follow instructions because unrelated non-violent charges were joined with violent ones, such that the jury might have reached the conclusion that the defendant was a bad and dangerous person." (quotation marks omitted)).

Higgins-Vogt's counsel were not ineffective for failing to raise these arguments, so he cannot establish cause for his procedural default of his indictment-related claims.  These claims are denied.

### C. Ineffective Assistance of Counsel Claims

Higgins-Vogt next asserts that his counsel provided ineffective assistance of counsel in numerous ways. First, he asserts that his counsel were ineffective in failing to ensure he knew what issues were being preserved for appeal. Pro Se 2255 Mot. 5. Second, as explained above, *see supra* Section II(B)(2), he asserts that his counsel were ineffective in failing to object to the indictment. Pro Se 2255 Mot. 6–11. Third, he asserts that his counsel were "ineffective for failing to inform [him] that they could pursue asking the court to perform a Federal Rules of Criminal Procedure Rule 403 Balancing Analysis for the May 20th and May 27th murder statements in [his] case." *Id.* at 11–13. Fourth, he asserts that his counsel were ineffective in litigating the motion to suppress. *Id.* at 13–16. And lastly, in his counseled motion, he asserts that the FPD provided him ineffective assistance of counsel. Counseled 2255 Mot. 25–26. The Government argues that Higgins-Vogt fails to meet either prong of *Strickland* with respect to each alleged error. *E.g.*, Resp. 30.

### 1. Appellate Rights

As noted above, *see supra* Section II(A)(2), pursuant to a written notice, Higgins-Vogt reserved the right to appeal the denial of his motion to suppress. While he initially frames this claim as a claim that his counsel did not adequately inform him of what issues he was preserving for appeal, he actually argues that his counsel did not "explain that certain parts of [his] motion to suppress would not be appealed." Pro Se 2255 Mot. 4–5. Again, whether issues were preserved for appeal is distinct from what issues were actually raised on appeal. The record demonstrates that Higgins-Vogt was adequately informed that he reserved the right to appeal the denial of the motion to suppress in its entirety. And Higgins-Vogt does not explain what issues he wanted to appeal that his attorneys failed to raise on appeal. Accordingly, he fails to

demonstrate that his attorneys provided constitutionally ineffective assistance with respect to what issues were preserved for appeal.

### 2. Indictment

As explained above, *see supra* Section II(B)(2)(ii), none of the arguments Higgins-Vogt thinks his counsel should have made against his indictment have merit. Accordingly, his counsel were not ineffective for failing to raise them.

### 3. Rule 403

Higgins-Vogt next argues that his attorneys should have "inform[ed] [him]" that they could ask the judge to "perform a Federal Rules of Criminal Procedure 403 Balancing Analysis" for his May 20 and May 27 statements. Pro Se 2255 Mot. 11. Presumably, he is referring to Federal Rule of Evidence 403, which allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Higgins-Vogt argues that "[t]he potential for prejudice greatly outweighs the probative value of introducing evidence of a murder at a trial that is not a murder trial." Pro Se 2255 Mot. 11. He also argues that without the evidence of Mars's murder, "the Government would be unable to present evidence to convict [him] of anything," as demonstrated by "[t]heir agreement to enter into a conditional plea." *Id.* at 12–13. The Government does not respond to this argument.

Nevertheless, the Court finds it meritless. Higgins-Vogt argues only that his counsel should have informed him of Rule 403, so it is unclear what prejudice he believes resulted. He does not contend, for example, that had he been aware of it, he would have insisted on going to trial and asking the court to exclude his statements under Rule 403. And even if he had so

alleged, he cannot show that such a request would have been successful.  Mars's murder was

alleged as an overt act in furtherance of the conspiracy, and the felon-in-possession charge was

based on Higgins-Vogt's possession of the gun that he used to kill Mars, so her murder was

eminently relevant to his charges.  Any prejudice to Higgins-Vogt would not be unfair simply

because the nature of his crime was disturbing.  *Cf. United States v. Hicks*, 368 F.3d 801, 807

(7th Cir. 2004) ("[M]ost relevant evidence, by its very nature, is prejudicial[.] [O]nly *unfairly*

prejudicial evidence *must* be excluded.").  Even if counsel should have informed Higgins-Vogt

of Rule 403, he has shown no prejudice from that failure.  His counsel, therefore, were not

constitutionally ineffective in this manner.

### 4.  Motion to Suppress

Higgins-Vogt alleges that his attorneys were ineffective in litigating the motion to

suppress in three ways.  Pro Se 2255 Mot. 13–16.  Some background on the motion to suppress

is necessary for analyzing these claims.

Higgins-Vogt's counsel filed a motion to suppress on his behalf, arguing that statements

he made to police on May 20 and May 27, 2015 were coerced by Sharon Brown, who worked at

the jail and held herself out to be a mental health professional.  *See* Mot. Suppress ¶¶ 18–19.

Judge Bruce held an evidentiary hearing on the motion.  Sept. 18, 2017 Min. Entry.

The Seventh Circuit's order in Higgins-Vogt's appeal offers a narrative summary of the

testimony and evidence presented at the hearing.  *See Higgins-Vogt*, 911 F.3d at 817–20.  As

relevant here, Brown was "a contractor working at Macon County jail and holding herself out as

a mental health counselor."  *Id.* at 817.  "She provided what she characterized as 'counseling' to

inmates under the title of 'Senior Law Enforcement Officer,'" though she had no licenses in the

mental health field, only an undergraduate degree in psychology.  *Id.* at 818.

Higgins-Vogt requested to meet with Brown—who he already knew from a prior term of incarceration—after being arrested on state charges in connection with the Circle K robbery. *Id.* At their first meeting, Higgins-Vogt told her that he had killed Mars. *Id.* While Brown told Higgins-Vogt she could not tell police due to confidentiality obligations, she also "told him that she 'wanted police to know so [the] murder victim's family could have closure.'" *Id.* (alteration in original) (quotation marks omitted). Brown continued to meet with Higgins-Vogt over the next few weeks, discussing childhood abuse Higgins-Vogt suffered, trying to get him "to gain empathy for Mars by discussing the Mars family with him," "offer[ing] her views on how Higgins-Vogt's mental state might impact his criminal case," and "suggesting that he was suffering from a psychological disorder known as 'disassociation'" which might make him "eligible for placement in a mental health facility." *Id.*

"On May 20, 2015, Higgins-Vogt told Brown that he wanted to meet with Detective Joe Patton, the lead detective investigating the Circle K robbery." *Id.* Brown arranged a meeting with Patton and Higgins-Vogt, and "Patton learned that Higgins-Vogt wanted to speak with him about the weapon used in the Mars murder." *Id.* They "moved into an interview room so the questioning could be recorded," and "[t]he Macon County State's Attorney joined the interview at Higgins-Vogt's request." *Id.* Brown remained present for the interview. *Id.* During this interview, "Higgins-Vogt provided details about the location of the shotgun used to kill Mars" but claimed that he had learned that information from Snyder. *See id.* at 819. In this interview, "Brown did not expressly contradict Higgins-Vogt's account or explicitly state that he had confessed to her," but she did "ask[] questions and elicit[] incriminating admissions from Higgins-Vogt, some of which she presumably learned during her prior 'confidential' meetings with him." *Id.*

20

On May 27, 2015, Higgins-Vogt "flagg[ed] down Correctional Officer John Mayer" and told him "that he wanted to confess to a murder and needed to speak to the police." *Id.* "Officer Mayer—who had no familiarity with the case and had never spoken with Higgins-Vogt about it—reacted by asking Higgins-Vogt to fill out an inmate request form. Higgins-Vogt did so, writing: 'I want to confess to the Paige Mars murder.'" *Id.* Officer Mayer notified a superior about the request and "also reached out to Brown because he noticed Higgins-Vogt appeared distraught and anxious." *Id.* Brown came to see Higgins-Vogt, who "told her that he had a conversation with his girlfriend earlier that day and she admonished him that if he had murdered someone he should feel terrible about himself and deserved to be held accountable." *Id.* Higgins-Vogt testified that this discussion with his girlfriend was "'the straw that broke the camel's back,' leading him to confess to the murder." *Id.*

Patton came to the jail that day to interview Higgins-Vogt again. Higgins-Vogt "explained that he wanted to confess to the murder, stating that he could no longer live with it and wanted to 'do what's right.'" *Id.* He "also insisted that he be able to tell his family and friends about his involvement in the murder before it became public, and Patton agreed." *Id.* Higgins-Vogt "then confessed in detail to" murdering Mars. *Id.* "Brown was once again present for the entire interview and at times questioned Higgins-Vogt or commented on his statements, including, for example, on his psychological state at the time of the murder." *Id.* at 819–20.

Higgins-Vogt saw his girlfriend the next day and told her that he had murdered Mars. *Id.* at 820. "He explained [to her] that he could no longer 'live with it' and 'had to come clean.'" *Id.* He also spoke with his mother and a family friend on the phone and told them he had confessed to Mars's murder. *Id.*

Judge Bruce denied Higgins-Vogt's motion to suppress.  Oct. 4, 2017 Order 1.  He found

that Brown was not an agent of law enforcement, *id.* at 14, and concluded that the evidence

showed that Higgins-Vogt "confessed because of a guilty conscience," *id.* at 15.  The Seventh

Circuit affirmed the denial of Higgins-Vogt's motion to suppress on the basis that his

"statements to law enforcement were entirely voluntary."  *Higgins-Vogt*, 911 F.3d at 817.  It

found that Brown did act as an agent of law enforcement but that "the facts and circumstances

show[ed] that Higgins-Vogt's decision to confess was the product of his own free will."  *Id.* at

822, 824.  It noted that there were facts pointing both in the direction of coercion and in the

direction of a free choice.  *Id.* at 822.  On the one hand, "Higgins-Vogt's interactions with

Brown, which he understood to be confidential counseling sessions, combined with her later

participation in law enforcement interviews, cast[ed] doubt on the voluntariness of Higgins-

Vogt's statements."  *Id.*  But on the other, Higgins-Vogt took "many affirmative steps . . . on his

own volition, the cumulative weight of which show that his statements to law enforcement . . .

were knowing and voluntary."  *Id.* at 823.  These included that he reached out to Brown and

asked for the meetings with law enforcement of his own initiative and that his May 27 confession

came after the earlier discussion with his girlfriend, which he "admitted . . . was 'the straw that

broke the camel's back.'"  *Id.*[7]

Higgins-Vogt argues that his attorneys were ineffective in litigating this motion in at least

three ways.  First, he argues they failed to call his state public defender, Timothy Tighe, who

could testify "that [Higgins-Vogt] was given a false promise of leniency in exchange for a

---

[7] The Seventh Circuit took care to note, however, its "strong disapproval of the role [Brown], who portrayed herself as a mental health counselor, was permitted to play within the Macon County jail." *Higgins-Vogt*, 911 F.3d at 817. It noted that she "was not a licensed mental health professional, met multiple times with Higgins-Vogt, and pledged him her confidentiality, only then to urge him to talk to the police after hearing his confession to the murder." *Id.* The Seventh Circuit opined that "[w]hat occurred has all the earmarks of a bait and switch of extraordinary gravity and potential consequence for Higgins-Vogt." *Id.*

confession." Pro Se 2255 Mot. 13. Second, he argues they should have cross-examined Brown (who he alleges made the false promise of leniency) differently to undermine her credibility. *Id.* at 13–15. And third, he suggests that counsel should have "raise[d] [that] the detective lied to [him] in order to get [him] to confess" by falsely promising to arrange a visit with family if he confessed. *Id.* at 15.

### i.  Calling Tighe

The Government argues that "counsel had valid strategic reasons for not calling [Tighe], reasons that should not be second-guessed by the Court." Resp. 33. It also argues that this "claim is unsupported by any evidence" because "Higgins-Vogt fails to provide any affidavit or statement . . . confirming that [Tighe] would have, in fact, confirmed that a promise of leniency was made to Higgins-Vogt." *Id.* at 33–34.

"Where a petitioner claims his trial counsel failed to call a witness, he must make a specific, affirmative showing as to what the missing evidence would have been, and prove that this witness's testimony would have produced a different result." *Patel v. United States*, 19 F.3d 1231, 1237 (7th Cir. 1994) (citation omitted). Here, as the Government notes, Higgins-Vogt has failed to make a specific showing supported by an affidavit to show what Tighe would have testified to, so he cannot show that his counsel were deficient in failing to call Tighe. *See United States v. Ashimi*, 932 F.2d 643, 650 (7th Cir. 1991) ("[E]vidence about the testimony of a putative witness must generally be presented in the form of actual testimony by the witness or on affidavit. A defendant cannot simply state that the testimony would have been favorable; self-serving speculation will not sustain an ineffective assistance claim." (footnote omitted)).[8]

---

[8] Because of Higgins-Vogt's lack of specificity, the Court does not know what he thinks Tighe would have testified to. But based on Tighe's testimony at a state court hearing, it surmises that Higgins-Vogt thinks Tighe would have testified that Brown told Higgins-Vogt that he could get an insanity plea if he confessed. Tighe testified at a hearing on a motion to suppress filed while Higgins-Vogt's case was still in state court that Higgins-Vogt "told [him] that he

23

Moreover, the Government provides a declaration from one of Higgins-Vogt's attorneys, Evan Bruno, in which Bruno states that after "thoroughly investigat[ing] the facts and the law," he and his co-counsel "made a strategic decision not to call . . . Tighe to testify" because "[h]is testimony was not necessary to the defense's theory of the case and could have opened a line of questioning by the prosecution that would have been detrimental to" Higgins-Vogt.  Bruno Decl. ¶ 3, Resp. Ex. B, ECF No. 65-2.  Higgins-Vogt provides no evidence to rebut Bruno's statement that this was a strategic decision.  *See Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986) ("Counsel's competence . . . is presumed and the defendant must rebut this presumption by proving that his attorney's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy." (citation omitted)).  He therefore fails to show his attorneys performed deficiently by failing to call Tighe at the motion to suppress hearing.

### ii.  Cross-Examination of Brown

As to Higgins-Vogt's second contention—that his attorneys should have cross-examined Brown differently to undermine her credibility—the Government argues that this is "an implausible theory presented without supporting evidence," which is "insufficient . . . to find Higgins-Vogt's counsel provided incompetent representation."  Resp. 35.  The Government also

---

had been told by . . . Brown that he had an insanity defense."  July 29, 2016 State Hr'g Tr. 8:3–4, ECF No. 18-2 at 69–100.  Tighe further testified that when meeting with Higgins-Vogt at the jail on one occasion, Higgins-Vogt brought Brown into the interview room and asked her to "[t]ell [Tighe] what [she] told [him]."  *Id.* at 8:4–10 (quotation marks omitted).  Tighe testified that Brown then "proceeded to discuss the various reasons why she thought [Higgins-Vogt] was insane" and not culpable in his criminal case.  *Id.* at 8:16–23.  The Seventh Circuit addressed this theory on appeal.  *See Higgins-Vogt*, 911 F.3d at 824.  It saw "nothing in the record to support Higgins-Vogt's suggestion that Brown exacted coercion by making a false promise of leniency to induce his confession" because he "point[ed] to nothing beyond Brown's telling him that he had a psychological disorder that may ultimately allow him to enter assisted living."  *Id.*  But it also stated that "even accepting . . . that as true," Higgins-Vogt still could not demonstrate "that Brown's statements were tantamount to a promise that compelled him to confess to the Mars murder."  *Id.*  The Court does not believe that Tighe's testimony would have changed this analysis.  All he could have done is corroborate that Brown suggested to Higgins-Vogt that he could pursue an insanity defense.

points to Bruno's declaration, *id.*, in which he states that he "questioned . . . Brown . . . to the extent [he] believed to be legally permissible and beneficial to [his] client's defense based on [his] legal training and experience," Bruno Decl. ¶ 4.

"[D]eciding what questions to ask a prosecution witness on cross-examination is a matter of strategy." *United States v. Jackson*, 546 F.3d 801, 814 (7th Cir. 2008). To show that counsel's cross-examination was deficient under the first prong of the *Strickland* test, a defendant must overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *United States v. Rodriguez*, 53 F.3d 1439, 1448 (7th Cir. 1995) (quotation marks omitted). And to show prejudice, the defendant must "explain[] . . . what [the witness's] responses to further cross-examination might have revealed" and "how those responses might have affected the result." *Id.* at 1449.

Higgins-Vogt fails to meet his burden to rebut the presumption of competence and fails to show prejudice. Bruno's declaration shows that he strategically chose how to cross-examine Brown. And, as the Government points out, Higgins-Vogt fails to specify what his counsel should have asked and what Brown's response would have been. *See* Resp. 34–35. He merely states that his counsel did not "sufficiently raise [the false promise of leniency] when questioning . . . Brown." Pro Se 2255 Mot. 13–14. Moreover, his counsel did ask Brown questions about her telling Higgins-Vogt he was dissociating during the crime and what kind of advice she gave him. Mot. Suppress Hr'g Tr. 137:25–148:9, ECF No. 32. Higgins-Vogt also complains that his attorneys did not "object" to Brown's credibility "when she ha[d] shown in state court that she will lie under oath." Pro Se 2255 Mot. 14. He does not specify what part of the state court record indicates that she lied under oath, and it is not the Court's responsibility to scour that record to find evidence to support his claim. *Cf. Gross v. Town of Cicero*, 619 F.3d 697, 702

(7th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in the record." (quotation marks and brackets omitted)).  Regardless, the only potential prejudice he identifies is that Judge Bruce relied on Brown's testimony to find that Higgins-Vogt asked Brown to contact Detective Patton on May 20, 2015.  *See* Pro Se 2255 Mot. 14.  But Detective Patton also testified both that Brown told him on that day that Higgins-Vogt wanted to speak with him and that he then met with her and Higgins-Vogt in her office before starting a recorded interview and "discussed the fact that [Higgins-Vogt] wanted to speak to [him] about the murder weapon."  Mot. Suppress Hr'g Tr. 25:3–19.  Thus, there was additional evidence that Higgins-Vogt had requested the meeting or, at the least, that he was interested in talking to police.[9]

Higgins-Vogt has failed to demonstrate that his attorneys provided ineffective assistance of counsel with respect to cross-examining Brown.

### iii.  Visit with Family

Finally, Higgins-Vogt claims that his counsel "failed to raise [that] the detective lied to [him] in order to get [him] to confess."  Pro Se 2225 Mot. 15.  He argues that the video of his confession would confirm that he "would only make a statement if [he] could visit with [his] family," and that Detective Patton agreed to that request but then never made it happen.  *Id.*  He cites *Haynes v. Washington*, 373 U.S. 503, 512 (1963), for the proposition that the court must consider "a promise to see family" as a factor in determining whether a confession was coerced.  Pro Se 2255 Mot. 15.  The Government does not specifically respond to this contention.

Nevertheless, the Court finds it belied by the record.  During his May 27, 2015 confession, Higgins-Vogt requested that he be the first one to "break[] the news" that he

---

[9] Higgins-Vogt also conceded that he had agreed to speak to police and that he gave Brown Detective Patton's name, *see* Mot. Suppress Hr'g Tr. 170:2–11, though he testified that she pressured him to speak to police the week prior to May 20.

murdered Mars to his family and friends "somehow" and Detective Patton responded that he could arrange "something where [Higgins-Vogt could] talk to them." Video of May 27, 2015 Interview at 13:23:12–13:24:45, Mot. Suppress Hr'g Ex. 6; *see also* Mot. Suppress Hr'g Tr. 34:14–19 (Patton testifying that Higgins-Vogt "wanted to be able to tell his girlfriend and his family that he had committed th[e] murder before it was released to the news media"). The record also shows that Detective Patton called Higgins-Vogt's girlfriend on his behalf the day of the interview to tell her that Higgins-Vogt wanted to see her, *id.* at 39:13–40:1; *id.* at 70:10–17, and that Higgins-Vogt saw her the next day, *see id.* at 40:4–6; *see also* Video of May 28, 2015 Jail Visit with Amy Ward, Mot. Suppress Hr'g Ex. 7. Moreover, the record shows that he called his mother the same day he talked to his girlfriend. Mot. Suppress Hr'g Tr. 41:4–6; *see also* Recording of May 28, 2015 Phone Call With Higgins-Vogt's Mother, Mot. Suppress Hr'g Ex. 8. Therefore, there is no evidence Detective Patton failed to deliver on his promise. And, in any case, *Haynes* does not support Higgins-Vogt's argument. In *Haynes*, the Supreme Court was reviewing the Washington Supreme Court's affirmance of a defendant's conviction for robbery. *Haynes*, 373 U.S. at 504. It held that the defendant's written confession was involuntary and thus constitutionally inadmissible at the defendant's trial. *Id.* at 513–15. In so holding, the Court relied on the fact that the defendant was being held "incommunicado"—police would not allow him to call an attorney, his wife, or anyone else for sixteen hours after his arrest, and "he was repeatedly told that he would not be allowed to call unless and until he 'cooperated' with police and gave them a written and signed confession admitting participation in the robbery." *Id.* at 504, 514.

> Confronted with the express threat of continued incommunicado detention and induced by the promise of communication with and access to family [the defendant] understandably chose to make and sign the damning written statement; given the

> unfair and inherently coercive context in which made, that choice cannot be said to
> be the voluntary product of a free and unconstrained will . . . .

*Id.* at 514.

The circumstances of *Haynes* are obviously quite different from this case.  Higgins-Vogt
was not being held without the ability to access an attorney or his family, and he was not told
that he could not speak with his family until he confessed.  Instead, he asked for a meeting with
Detective Patton so that he could confess and requested that he be able to tell his family before
the media found out that he committed the murder.

Higgins-Vogt fails to show his attorneys performed deficiently by failing to argue that
this promise by Detective Patton lent itself to a finding that his confession was coerced.

### 5. FPD Claims

Higgins-Vogt's last ineffective assistance claims are based on the FPD's alleged
incompetence.  Counseled 2255 Mot. 25–26.  First, he argues that the FPD provided ineffective
assistance of counsel by "failing to include claims [based on Judge Bruce's communications with
the USAO] in direct appeals once the full scope of the *ex parte* communications was revealed."
*Id.* at 26.  Second, he argues that the FPD provided ineffective assistance of counsel by failing to
secure tolling agreements so that Higgins-Vogt could raise claims based on Judge Bruce's
communications in a § 2255 motion.  *Id.*  The Government argues that these claims can "be
readily dismissed" because "[t]he FPD did not represent Higgins-Vogt in either the original
district court case or at the appellate court" and because "the claims of error . . . are premised on
the FPD's internal knowledge of Judge Bruce's conduct from other criminal matters and on a
tolling agreement entered into only between the FPD and the USAO."  Resp. 27.

The Court agrees that these claims are meritless.  The FPD did not represent Higgins-
Vogt during his appellate proceedings and accordingly could not have provided him with

constitutionally ineffective assistance of counsel.  And Higgins-Vogt had no right to

postconviction counsel, so any alleged error with respect to obtaining a tolling agreement for

postconviction review could not constitute a Sixth Amendment violation.  *See Coleman v.*

*Thompson*, 501 U.S. 722, 756 (1991) ("[A] criminal defendant has no right to counsel beyond his

first appeal . . . ."); *cf. Garza v. Idaho*, 139 S. Ct. 738, 749 (2019) ("There is no right to counsel

in postconviction proceedings . . . ." (citation omitted)).

### D.  Claims Related to Judge Bruce

Both the due process and § 455(a) claims are based on *ex parte* communications between

Judge Bruce and the USAO that became public in August 2018.  These communications have

been detailed and summarized elsewhere.  *See Shannon v. United States*, 39 F.4th 868, 876, 883

(7th Cir. 2022) (citing *In re Complaints Against District Judge Colin S. Bruce*, Nos. 07-18-90053

& 07-18-90067 (7th Cir. Jud. Council May 14, 2019), http://www.ca7.uscourts.gov/judicial-

conduct/judicial-conduct_2018/07_18-90053_and_07-18-90067.pdf).  Higgins-Vogt argues that

that these communications demonstrate that Judge Bruce was actually biased against him,

resulting in violation of his due process rights, and, alternatively, that they demonstrate an

appearance of bias that required Judge Bruce to recuse himself under 28 U.S.C. § 455(a).  *See*

Counseled 2255 Mot. 14–15.  The Government argues that these claims are procedurally

defaulted, that Higgins-Vogt cannot show that Judge Bruce was biased against him, and that an

appearance of bias claim is not cognizable on collateral review and, in any case, "any appearance

of bias in the present case was insufficient to necessitate reversal or a resentencing."  Resp. 39–

40.

### 1.  Procedural Default

Again, "[a] claim cannot be raised for the first time in a § 2255 motion if it could have been raised at trial or on direct appeal."  *McCoy*, 815 F.3d at 295.  As the Government points out, *see* Resp. 47–48, Higgins-Vogt's appeal was pending until December 2018, so he could have raised a claim based on Judge Bruce's communications while his appeal was still pending. Higgins-Vogt acknowledges that he failed to do so and vaguely asserts that he "has good cause for failing to do so."  Counseled 2255 Mot. 25.  In the next section of his counseled motion, he asserts that the FPD "was ineffective for failing to include claims in direct appeals once the full scope of the *ex parte* communications was revealed."  *Id.* at 26.  But, as noted above, the FPD did not represent Higgins-Vogt on appeal, so this claim of ineffective assistance of counsel cannot excuse his procedural default.  *See supra* Section II(C)(5).  Higgins-Vogt does not advance any other argument that he has cause for his procedural default.  As a result, the Court finds that Higgins-Vogt procedurally defaulted his claims based on Judge Bruce's communications and he cannot raise them for the first time via § 2255 motion.

### 2.  Due Process

Even if the due process claim was not procedurally defaulted, the Court would deny it on the merits.  "Due process requires 'a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case.'"  *Shannon*, 39 F.4th at 883 (quoting *Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997)).  A due process claim can be proved by evidence of the judge's actual bias or by showing that "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable."  *Id.* (quoting *Rippo v. Baker*, 580 U.S. 285, 287 (2017)).

The Seventh Circuit has decided a few cases involving due process bias claims based on Judge Bruce's *ex parte* communications which are instructive here. In *United States v. Williams*, 949 F.3d 1056, 1061–63 (7th Cir. 2020), the court held that Judge Bruce presiding over a defendant's trial did not violate the defendant's due process rights where the defendant relied primarily on the *ex parte* communications but the communications did not concern the defendant's case. It noted that the Special Committee appointed by the Judicial Council of the Seventh Circuit to review complaints against Judge Bruce related to the communications "found no evidence and received no allegation that Judge Bruce's conduct or ex parte communications impacted any of his rulings or advantaged either party." *Id.* at 1061–62 (quotation marks omitted). Moreover, the court noted that though the communications exposed a preexisting relationship with members of the USAO, such a relationship "alone does not create a due process violation." *Id.* at 1062. It found that the defendant had "presented no evidence to rebut th[e] presumption" that "judges rise above . . . potential biasing influences." *Id.* (quotation marks omitted). Higgins-Vogt relies on the same communications that were relied on in *Williams* and considered by the Special Committee, and he points to no emails that concern his case specifically. *See* Counseled 2255 Mot. 7–14, 16–17.

In *Shannon*, the Seventh Circuit found that Judge Bruce's participation in a defendant's sentencing hearing, as opposed to only his trial, may warrant a different result under the due process clause because judges have considerable discretion at sentencing. *Shannon*, 39 F.4th at 884–86. In that case, Judge Bruce made comments at sentencing that the court concluded could have been interpreted as a warning that if the defendant appealed, he would impose a harsher sentence. *Id.* at 886–87. Though it ultimately declined to rule on whether there was a due process violation, the Seventh Circuit appeared to be troubled by the combination of the *ex parte*

31

communications and the comments.  *See id.* at 884 (declining to resolve the constitutional issue and instead remanding for resentencing under the court's supervisory authority).  Higgins-Vogt points to no similar comment at sentencing that would lend itself to a finding that Judge Bruce was biased against him.  Instead, he is relying on the communications alone.  *See* Counseled 2255 Mot. 16–17.  The Court thus finds that Higgins-Vogt has failed to show either actual bias or a risk of bias so high that it violates due process.

### 3.  Section 455(a)

The Court would also deny the § 455(a) claim on the merits if it was not procedurally defaulted.  Under 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."  The Government does not appear to dispute that Judge Bruce's impartiality might reasonably have been questioned and, thus, that he should have recused himself from Higgins-Vogt's case under § 455(a).[10]  It does argue, however, that this statutory claim is not cognizable and that even if it were, it would not warrant the relief Higgins-Vogt seeks.  *E.g.*, Resp. 39–40.

The Court agrees that Higgins-Vogt's § 455(a) claim is not cognizable under § 2255.  Section 2255 "was intended to afford federal prisoners a remedy identical in scope to federal habeas corpus."  *Davis v. United States*, 417 U.S. 333, 343 (1974).  Although the language of § 2255 suggests that a prisoner can obtain relief if his sentence was imposed in violation of the "laws of the United States," § 2225(a), not "every asserted error of [nonconstitutional] law can be raised on a § 2255 motion."  *Davis*, 417 U.S. at 346.  The "appropriate inquiry [i]s whether the claimed error of law was a fundamental defect which inherently results in a complete

---

[10] To the Court's knowledge, the Government has conceded an appearance of impropriety—and thus a violation of § 455(a)—in every case involving Judge Bruce's communications that has been decided by the Seventh Circuit so far.  *See, e.g.*, *United States v. Atwood*, 941 F.3d 883, 885 (7th Cir. 2019); *Williams*, 949 F.3d at 1063; *United States v. Orr*, 969 F.3d 732, 738 (7th Cir. 2020).

miscarriage of justice, and whether it presents exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Id.* (quotation marks and alterations omitted); *see also Reed v. Farley*, 512 U.S. 339, 348 (1994) (noting the standard as whether the federal law violation qualifies as "a fundamental defect which inherently results in a complete miscarriage of justice [or] an omission inconsistent with the rudimentary demands of fair procedure" (alteration in original) (quotation marks omitted)).[11]

Two circuit courts have addressed whether a § 455(a) claim is cognizable on a § 2255 motion.[12]  In *United States v. Couch*, 896 F.2d 78, 81 (5th Cir. 1990), the Fifth Circuit found the relevant inquiry to be "whether there was an appearance of impropriety which rose to the level of a fundamental defect resulting in a complete miscarriage of justice."  *Id*. (quotation marks omitted).  It held that "[a]bsent that level of severity, the claim of an appearance of impropriety is not cognizable under 28 U.S.C. § 2255."  *Id.*  It noted that "section 455 and the Due Process Clause are not coterminous" and that "conduct violative of section 455 may not constitute a due process deficiency."  *Id.*  And it appeared to hold that a § 455(a) claim is only cognizable where the § 455(a) violation falls "within [a] protected constitutional dimension" where § 455 and the Due Process Clause overlap.  *Id.* at 82, 83.[13]

---

[11] Although *Reed* involved a motion under 28 U.S.C. § 2254, *Reed*, 512 U.S. at 347, the Supreme Court held that the same standard that applies to determining whether a nonconstitutional federal law violation is cognizable on § 2255 review applies to § 2254 cases, *id.* at 353–54.

[12] In an unpublished opinion, the Tenth Circuit addressed a § 455 bias claim on § 2255 review because the petitioner "assert[ed] that he was unaware of the facts allegedly warranting recusal when direct review was available." *United States v. Austin*, 48 F.3d 1233, at *1 & n.2 (10th Cir. 1995) (table opinion) (citing *Hardy v. United States*, 878 F.2d 94, 97 (2d Cir. 1989)).  But as this case is unpublished and does not analyze this issue specifically, it is not persuasive, and the Court will not address it here.

[13] The Fifth Circuit's precise holding as it relates to the facts of the case is not clear.  The district judge considering the defendant's § 2255 motion had resentenced the defendant "to comply with the spirit and beyond of *Liljeberg* [v. *Health Servs. Acquisition Corp.*, 486 U.S. 847 (1988)]."  *Couch*, 896 F.2d at 80 (quotation marks omitted).  The Fifth Circuit found that the alleged § 455(a) violation did not fall within protected constitutional dimensions warranting § 2255 relief.  *Id.* at 82, 83 ("We conclude and hold that Couch's claims of an appearance of impropriety do not rise to the level of a fundamental defect in due process cognizable under 28 U.S.C. § 2255.").  It noted that by resentencing the defendant, the district judge had accorded him "a measure of process well beyond that due on the facts of his case," but that it was "within [the judge's] power to do so."  *Id.* at 82.  The Fifth Circuit does not make

In *Hardy v. United States*, 878 F.2d 94, 97 (2d Cir. 1989), the Second Circuit assumed without deciding "that as a general matter collateral attack upon a criminal sentence may be available under section 2255 to pursue a claim of appearance of impartiality." It made this assumption based on the Supreme Court's decision in *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988). *Liljeberg* involved a motion under Federal Rule of Civil Procedure 60(b)(6) to vacate a civil judgment on the basis that the judge should have recused himself under § 455(a). *Liljeberg*, 486 U.S. at 858, 863. Rule 60(b)(6) allows district courts to grant relief from a final civil judgment in "extraordinary circumstances." *Id.* at 863–64 (quotation marks omitted). The Supreme Court held that

> in determining whether a judgment should be vacated for a violation of § 455(a), it is appropriate to consider the risk of injustice to the parties in the particular case, the risk that the denial of relief will produce injustice in other cases, and the risk of undermining the public's confidence in the judicial process.

*Id.* at 864. The Second Circuit in Hardy noted initially that it "doubt[ed] that an *appearance* of impropriety under section 455(a), without more, [would] constitute[] the type of 'fundamental defect' that would justify vacating an otherwise lawful sentence under section 2255." *Hardy*, 878 F.2d at 97. It reasoned that, after *Liljeberg*, it was "not certain" whether the Court would similarly hold that a criminal judgment may be collaterally attacked based on an appearance of impropriety but concluded that "the analogy [wa]s sufficiently close to warrant" the assumption that it would "for purposes of [that] appeal." *Id.* The only dispositive holding from the Second Circuit in *Hardy*, however, was that the defendant could not obtain relief under section 2255 because she was aware of the basis for the judge's recusal when direct appeal was available. *Id.* at 98.

---

explicit what gave the judge the power to resentence the defendant but seemed to hold that it was not required or warranted under § 2255.

34

Like in *Couch*, the Court finds that a § 455(a) claim could be cognizable on § 2255 review, but only if it meets the standard laid out in *Davis*. Under that standard, the alleged § 455(a) error must be "a fundamental defect which inherently results in a complete miscarriage of justice" and "present[] exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent." *Davis*, 417 U.S. at 346 (quotation marks omitted). The alleged error here does not rise to that level. As noted above, Higgins-Vogt has not established a due process violation and has no evidence that any of Judge Bruce's communications or relationships with the USAO impacted his proceedings or prejudiced him. *Cf. Bachner v. United States*, 517 F.2d 589, 597 (7th Cir. 1975) ("The remote and theoretical possibility that a complete miscarriage of justice might have occurred is not enough to satisfy the Davis test, when in fact no injustice has been done."); *Reed*, 512 U.S. at 350–52 (finding a state court's failure to comply with the Interstate Agreement on Detainers was not cognizable on § 2254 review where the defendant did not object and no prejudice resulted because the case "lack[ed] aggravating circumstances rendering the need for the remedy afforded by the writ of habeas corpus . . . apparent" (second alteration in original) (quotation marks omitted))). Though he argues that Judge Bruce made three discretionary decisions that impacted his case—the ruling on the motion to suppress, allowing him to plead guilty without an adequate factual basis, and sentencing him to consecutive terms of imprisonment, Counseled 2255 Mot. 3–6—he makes no argument that the appearance of bias impacted these decisions. Regardless, as explained above, the ruling on the motion to suppress was affirmed on appeal, *see supra* Section II(C)(4), and there was an adequate factual basis for Higgins-Vogt's plea, *see supra* Section II(A)(1). And Higgins-Vogt was sentenced within the Sentencing Guidelines range that would have applied absent the statutory maximums on each count: 360 months to life. *See* PSR ¶ 113. Finally, any violation of

§ 455(a) would have no bearing on Higgins-Vogt's guilt or innocence. *See Hussong v. Warden*, 623 F.2d 1185, 1185, 1191 (7th Cir. 1980) (finding that a § 2254 "petitioner's incarceration in violation of section 2515 of the federal wiretap statute d[id] not meet the required 'complete miscarriage of justice' standard required of nonconstitutional violations of federal law in order to be cognizable under the federal habeas corpus statute," noting in part that "the issues he ask[ed] [the court] to redetermine h[ad] no bearing on the basic justice of his incarceration" and that nothing in the record indicated he was not guilty (quotation marks omitted)).

The Court does not find that *Liljeberg* requires a different result. *Liljeberg* identified three factors for determining whether a civil judgment should be vacated under Rule 60(b)(6) due to extraordinary circumstances. *See Liljeberg*, 486 U.S. at 858. And in *United States v. Atwood*, 941 F.3d 883, 885 (7th Cir. 2019), the Seventh Circuit used those factors to determine whether a statutory recusal error was harmless on appeal. The *Davis* standard for nonconstitutional errors requires more than a showing of extraordinary circumstances or that a statutory error was not harmless. It is a "well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady*, 456 U.S. 152, 166 (1982). Even if the Court found that the error was not harmless under those factors, that would not suffice to meet the *Davis* standard. *See* Brian R. Means, Federal Habeas Manual § 1:38 (May 2022 Update) (noting that the *Davis* "standard is more onerous . . . than the harmless error test applied to non-constitutional claims raised on direct appeal"); *United States v. Addonizio*, 442 U.S. 178, 184 (1979) ("It has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment."). "There is a difference between reversing an

error on appeal and correcting the error years later." *Hawkins v. United States*, 706 F.3d 820, 824 (7th Cir. 2013).

Here, Higgins-Vogt has not shown that any violation of § 455(a) was a fundamental defect resulting in a complete miscarriage of justice. His § 455(a) claim, therefore, would not warrant relief under § 2255.

## CONCLUSION

Accordingly, Defendant-Petitioner Matthew Higgins-Vogt's *pro se* motion under 28 U.S.C. § 2255, ECF No. 58, and counseled Motion to Vacate Sentence Pursuant to 28 U.S.C. § 2255, ECF No. 64, are DENIED. His motion for a status conference, ECF No. 67, is MOOT in light of this ruling. The Clerk is directed to enter judgment and close the accompanying civil case, No. 2:20-cv-02033-SLD.

Entered this 27th day of March, 2023.

s/ Sara Darrow
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE